UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

PABLO MENEZES CRUVINEL,

                       Petitioner,

v.

LEILA COELHO SOARES CRUVINEL,

                       Respondent.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

19-CV-4237 (LDH) (SIL)

LASHANN DEARCY HALL, United States District Judge:

Petitioner Pablo Menezes Cruvinel filed the instant petition pursuant to the Hague Convention Treaty on the Civil Aspects of International Child Abduction (the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act (the "ICARA") against Respondent Leila Coelho Soares Cruvinel seeking the return to Brazil of their 13-year-old daughter ("AC"), who currently lives with Respondent in the United States.

## PROCEDURAL HISTORY

The Court held a virtual hearing commencing December 7, 2020. Petitioner testified on his own behalf. Respondent, Dr. Peter Favaro, a forensic psychiatrist, and Isabela Guimaraes Del Monde, an expert in women's and human rights in Brazil, each testified on Respondent's behalf. The parties submitted written direct testimony for these witnesses, which was admitted into evidence during the hearing.[1] The witnesses were cross-examined during the virtual hearing. With the parties' consent, the Court also examined AC *in camera*.

---

[1] The direct testimony of Dr. Favaro and Ms. Del Monde were submitted as declarations and accompanying expert reports. (*See* Direct Testimony of Isabela Guimaraes Del Monde ("Del Monde Decl."), ECF No. 42; Del Monde Decl., Ex. A, ECF No. 42-1; Direct Testimony of Dr. Peter J. Favaro ("Favaro Decl."), ECF No. 43; Favaro Decl., Ex. A, ECF No. 43-1.)

# FINDINGS OF FACT[2]

## I. Credibility Determinations

The testimony of AC is credible. AC presented as exceptionally mature and articulate for her age. Additionally, the testimony of Dr. Favaro and Ms. Del Monde is credible. Their testimony was well-reasoned, and their credentials are unassailable. Petitioner neither presented his own experts to controvert their testimony nor effectively undermined the qualifications or opinions of Respondent's experts on cross-examination. Last, Respondent's testimony is credible. Respondent presented as authentic, and her testimony was consistent with the record. By contrast, Petitioner's testimony is not credible to the extent that it was controverted by other evidence in the record.[3]

## II. Petitioner and Respondent's Relationship Before Marriage

Petitioner and Respondent met in Brazil in 2002. (Direct Examination Testimony of

---

[2] The following findings of fact and conclusions of law are made in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that any of the findings of fact herein may be deemed conclusions of law, the Court shall also consider them to be conclusions. Similarly, to the extent that any of the conclusions of law may be deemed findings of fact, the Court shall consider them to be findings.

[3] Petitioner's testimony contained multiple inconsistencies. *Compare* Evid. Hr'g Tr. vol. 1, 36:17–20, Dec. 7, 2020 ("Q: Mr. Cruvinel, your father asked you to move out of his house because you said or did some things that made him nervous? A: No. Never") *with id.* at 39:4–9 ("THE COURT: . . . The question to you was whether you told your daughter that your father asked you to move out because things you said made him nervous. That is what you told your daughter. A: That's what I wrote. That's what I said. That was my experience. That's how I expressed myself to her in this way.").

*Compare id*. 44:14–19 ("THE COURT: . . . Mr. Cruvinel, in your prior response you stated that the Brazilian court made a determination that you were the more appropriate parent for AC to live with. Did I hear that correctly?" A: In the beginning, yes. In principle, yes.") *with id.* at 45:8–12 ("THE WITNESS: It was actually—it was actually—well, actually, it was an informal conversation between my daughter and myself because my house has a swimming pool and it was more appropriate for the child, but no written documentation from the Courts.").

*Compare id*. 65:10–12 ("Q: And by [January 4, 2017] you were in a relationship with Lorrana, who we discussed earlier, right? A: No, I met Lorrana afterwards.") *with id.* at 67:19–68:4 ("A: No, you know, we decided to do that. I had already met [Lorrana], you know, and after one month—actually after three weeks that I met her, you know, we tried to stay together. And then we decided, you know, let's try to have a stable union, let's try to be together . . . Q: So you obtained a civil union with Lorrana on January 4th, 2017, correct? A: Correct.").

*Compare id*. 75:17–18 ("Q: Mr. Cruvinel, you own a gun, right? A. No.") *with* Declaration of Andrew D. Huynh ("Huynh Decl."), Ex. 17, ECF No. 30-19 (photo of a gun sent by Petitioner to AC via WhatsApp message).

Respondent Leila Coelho Soares Cabral ("Cabral Decl.") ¶2–3, ECF No. 41.) Although the early part of their relationship went well, Respondent quickly learned that Petitioner frequently drank alcohol and would become verbally and physically aggressive. (*Id*. ¶ 4; Evid. Hr'g Tr. vol 1, 147:2–4, Dec. 7, 2020.) On one occasion, for example, Petitioner arrived at Respondent's home drunk, aggressively badgered her until she came down from her apartment, then yanked her into his car. (Cabral Decl. ¶ 4.) This was the first of many incidents of aggressive physical behavior by Petitioner while he was intoxicated. (*Id*.) Nonetheless, Petitioner and Respondent moved in together in May 2003. (*Id*. ¶ 5.)

Soon thereafter, Respondent learned that Petitioner's substance abuse involved drugs (e.g., "pills") in addition to alcohol. (*Id*. ¶ 5–6.) Petitioner became more abusive—ridiculing, degrading, grabbing, and yelling at Respondent—all while intoxicated. (*Id*. ¶ 6.) Petitioner routinely referred to Respondent as "lazy," "good for nothing," a "whore," and a "cunt." (*Id*.) On one occasion, after Petitioner came home drunk, he threatened to push Respondent off their sixth-floor balcony. (*Id*. ¶ 7.) On another occasion, Petitioner locked Respondent in their apartment preventing her from leaving. (*Id*. ¶ 8.)

### III. Petitioner and Respondent's Marriage

Petitioner and Respondent were married in early 2007. (Joint Pretrial Order, at 3, ECF No. 37.) AC was born on March 2, 2007. (*Id*.) Although Respondent hoped that Petitioner's behavior would change with the arrival of AC, his substance abuse only worsened, with petitioner frequently drinking and getting "high from marijuana and painkillers." (Cabral Decl. ¶ 13.) Indeed, Petitioner left Respondent in the hospital maternity ward to go drinking with his friends upon the birth of AC. (*Id*. ¶ 12.) Although Respondent tried to persuade Petitioner to seek counseling for his substance abuse, Petitioner refused. (*Id*. ¶ 13.) Instead, Petitioner drank

3

almost every night and came home to Respondent and AC drunk and aggressive. (*Id.*) Throughout the marriage, Petitioner regularly berated and yelled at Respondent in front of AC and made no effort to conceal his aggression or substance abuse. (*Id.* ¶¶ 13, 14, 16; Evid. Hr'g Tr. vol. 3, 238:14–239:14, Dec. 9, 2020.)

Petitioner's aggressive behavior continued when AC entered primary school. (Cabral Decl. ¶ 18.) On December 8, 2014, when AC was seven years old, Petitioner and Respondent had a particularly violent argument. (*Id.*) Petitioner began yelling at Respondent while at the kitchen table, shouting that she was a "slut" and "worthless," and yelling "I will have you killed!" (*Id.*) Petitioner then began punching the kitchen table before pulling off the tablecloth and knocking its contents to the floor. (*Id.*) Respondent ran out of the apartment hoping to get to the police station, but Petitioner chased after her with a broomstick, hid the car keys, and broke their car mirrors with the broomstick. (*Id.*) Respondent ultimately took a taxi to the police station and filed a police report of the incident. (*Id.* ¶ 19.) Still, after returning home, Respondent accepted Petitioner's apology and decided to stay in a relationship with Petitioner. (*Id.*) However, the violence continued.

On July 20, 2016, Respondent took AC to her cousin's debutante party. (*Id.* ¶¶ 22–23.) The party ran late and, when Respondent and AC eventually returned home, Petitioner, who was drunk, became upset and began to argue with Respondent. (*Id.* ¶ 23; Evid. Hr'g Tr. vol. 3, 239:18–23, 240:1–14, Dec. 9, 2020.) Respondent went to AC's bedroom to sleep on a mattress on the floor. (Cabral Decl. ¶ 23; Evid. Hr'g Tr. vol. 3, 240:22-25, Dec. 9, 2020.) Respondent did not want to engage with Petitioner while he was intoxicated, but Petitioner continued to bang on the bedroom door, yelling and threatening to knock down the door if Respondent did not open it. (Cabral Decl. ¶ 24; Evid. Hr'g Tr. 241:7–8.) When Respondent finally opened the door,

4

Petitioner entered the bedroom, threw the contents of the bedside table about the room, and tried to suffocate Respondent with the mattress. (Cabral Decl. ¶¶ 25–26; Evid. Hr'g Tr. vol. 3, 241:10–22, Dec. 9, 2020.) AC, who was nine years old at the time, was awake and "petrified" in the next bed. (Cabral Decl. ¶¶ 25–26.) Petitioner continued to suffocate Respondent with the mattress until AC yelled for him to stop. (*Id.* ¶ 26; Evid. Hr'g Tr. vol. 3, 241:23–25, Dec. 9, 2020.)

The next day, Respondent and AC left Goiania, where they lived at the time. (Cabral Decl. ¶ 27.) Respondent filed a police report and took AC to Tocantins, Brazil. (*Id.*; Huynh Decl., Ex. 1 at 7–8, ECF No. 29-1 (police report).) Over the next week, Petitioner called Respondent repeatedly, insisting that he would change his behavior. (Cabral Decl. ¶ 28.) Respondent returned to Goiania for a couple of weeks but nothing changed. (*Id.* ¶¶ 28–29.) Throughout this time, AC repeatedly asked Respondent why she would not divorce Petitioner. (*Id.* ¶ 29.)

The abuse suffered by Respondent had a direct impact on AC. Indeed, AC testified that she "lived in a home where [she] only experienced . . . a lot of aggression. [She] didn't really experience that much love" and she "could see that [her] dad [was] also very bipolar sometimes and he does have a lot of anger issues and [she] experienced everything that a child should have not experienced." (Evid. Hr'g Tr. vol. 3, 237:16–24, Dec. 9, 2020.) AC testified that Respondent tried to make her "feel like [she] had a home" and was safe and could "express [her] emotions" and "live happily." (*Id.* 238:16–22.) For instance, in consultation with AC's teachers, Respondent sought the assistance of mental health professionals to help AC cope with her volatile home life. (Evid. Hr'g Tr. vol. 2, 151:19–21; 152:6–20, Dec. 8, 2020.)

IV.     **Petitioner and Respondent's Separation and Divorce**

5

Petitioner and Respondent formally separated in or around August 2016. (Cabral Decl. ¶ 30.) They shared joint custody of AC, though AC spent the majority of time with Respondent. (*Id.* ¶ 33.) During the first few months of their separation, Petitioner rarely saw AC. (*Id.*) And when AC stayed with him, Petitioner continued to abuse substances and failed to provide AC with any structure. (*Id.* ¶ 34.) On January 4, 2017, Petitioner entered a civil union with his then-girlfriend, Lorrana. (*Id.* ¶¶ 39, 40; Evid. Hr'g Tr. vol. 1, 66:17–67:3, Dec. 7, 2020.) The same day, Petitioner drunkenly called Respondent and threatened to "do away" with her and destroy the computers at Respondent's workplace. (Cabral Decl. ¶ 39.) Respondent then went to her workplace where she discovered Petitioner. (*Id.* ¶ 40.) Petitioner then drunkenly called her a "whore" and "bitch." (*Id.*) Petitioner showed Respondent his civil union contract before throwing a computer at Respondent. (*Id.*) Respondent called the police in fear for her safety. (*Id.*) When the police arrived, they arrested Petitioner. (*Id.*) Both Respondent and a police officer at the scene provided statements, describing Petitioner's belligerent behavior and violent conduct. (*Id.*; Huynh Decl., Ex. 1 at 3–4.)

Petitioner and Respondent divorced on April 26, 2018. (*See* Huynh Decl., Ex. 5, ECF 30-7.) The divorce decree provided that Respondent would maintain primary residential custody of AC and that Petitioner would retain "free form" joint custody of AC with Respondent. (*Id.* at 2.)

## V. Respondent and AC's Move to the United States

In May of 2018, Respondent informed Petitioner that she intended to move to New York with AC. (Cabral Decl. ¶ 46.) After Respondent obtained a passport for AC, Petitioner signed AC's Brazilian travel authorization form, which was valid for three months. (*Id.* ¶¶ 49, 57; Huynh Decl., Ex. 7, ECF No. 30-9.)

## VI. AC's Life in the United States

Respondent and AC settled in Mineola, New York, with Jean Cabral on August 13, 2018. (Cabral Decl. ¶ 59.) On September 6, 2018, Respondent and Mr. Cabral married. (*Id.* ¶ 60.) In June 2019, Respondent gave birth to her second daughter. (*Id.* ¶¶ 60, 62.) AC has described her half-sister as "her dream." (*Id.* ¶ 62; Huynh Decl., Ex. 10 at 3, ECF No. 30-12.)

In September of 2018, AC enrolled in Mineola Middle School as a sixth-grade student. (Cabral Decl. ¶ 61.) AC adjusted quickly to her new environment: her teachers and school administrators reported that she appears to be very happy, has made many friends, and is involved in a number of extracurricular activities, such as the jazz band. (*Id.*; Huynh Decl., Ex. 28, ECF No. 30-30.) AC also enrolled in private, weekly piano lessons. (Cabral Decl. ¶ 61.) AC testified unequivocally that she wants to remain in the United States and believes that, "[i]t's actually pretty fun in here. I feel like it's a better experience at living here than in Brazil, like—and financial issues and also social issues. I feel like it's better than Brazil." (Evid. Hr'g Tr. vol. 3, 234:11–14, Dec. 9, 2020.) She also testified that, "[h]ere there's just better jobs opportunities than in Brazil. Yeah, that's basically job opportunities. . . . For my parents—for my—well, my stepdad already has a job, he's also in the job right now. It's for my mom though." (*Id.* at 247:7–13; *see also id.* at 246:22–247:3 ("THE COURT: But in terms of where you want to live, where do you want to live? AC: Here definitely . . . I just feel it's like, as I said in the beginning, it's a better way of living here than Brazil is.").) AC has expressed her preference to remain in the United States to Petitioner on numerous occasions over the last two years. (*See, e.g.*, Huynh Decl., Ex. 10 (messages from A.C. to Petitioner); Huynh Decl., Ex. 19, ECF No. 30-21 (same).)

7

## VII. AC's Relationship with Petitioner

Throughout their time in the United States, Respondent has ensured that AC kept in contact with her father. (Cabral Decl. ¶ 63.) Though Petitioner and AC have kept in touch by message and phone, his messages to AC have included threats, bribes, guilting and coercive messages, and lies. In one message, Petitioner told AC:

> You will be a bastard daughter there, because your mother will be with her daughter and her husband[.] Your father is here, you will be a bastard daughter there. Your mom is going to make you work and do everything for her. You will be a maid for them, and you will be a bastard daughter.

(Huynh Decl., Ex. 20 at 3–4, ECF No. 30-22; *see also*, Huynh Decl, Ex. 30 at 3, ECF No. 30-32 (messages from Petitioner to AC); Ex. 43 at 3, ECF No. 30-45 (same); Ex. 14 at 3, ECF No. 30-16 (same); Ex. 9 at 3–8, ECF No. 30-11 (same); Ex. 10 at 3 (same); Ex. 36 at 3–11, ECF No. 30-38 (same); Ex. 27 at 3–8, ECF No. 30-29 (same); Ex. 26 at 3–9, ECF No. 30-28 (same); Ex. 29 at 3–4, ECF No. 30-31 (same); Ex. 32 at 3–6, ECF No. 30-34 (same); Ex. 11 at 3–5, ECF No. 30-13 (same); Ex. 12 at 3–5, ECF No. 30-14 (same); Ex. 25 at 3–9, ECF No. 30-27 (same); Ex. 45 at 3–7, ECF No. 30-47 (same).) Petitioner has sent multiple messages to AC, including a photo of his gun, threatening that his lawsuit would send Respondent to jail and force AC to return to Brazil against her will. (*See* Huynh Decl., Ex. 17 (message from Petitioner to AC containing a photo of a gun); Ex. 16 at 4, ECF No. 30-18; Ex. 33 at 4–7, ECF No. 30-35; Ex. 18 at 3–4, ECF No. 30-20; Ex. 22 at 6–7, ECF No. 30-24; Ex. 12 at 3; Ex. 45 at 3–7.) Petitioner's messages have caused AC to be afraid, stressed, and to cry. (Cabral Decl. ¶ 71; Evid. Hr'g Tr. vol. 3, 247:25–248:7, Dec. 9, 2020.) Most recently, AC has been hesitant to open Petitioner's messages because of the stress they cause her. (Cabral Decl. ¶ 71)

## VIII. AC's Psychological Well-Being

Dr. Favaro testified that Petitioner's aggressive behavior is both troubling and dangerous. (Favaro Decl., Ex. A at 7.) This risk of danger is exacerbated by Petitioner's substance abuse. (*Id.* at 8.) As a result of the physical and psychological "stressors" to which AC was exposed, she will likely "retain memories that create fear, anxiety, panic and emotional distress and trauma if forced to return to those stressors." (Favaro Decl., Ex. A at 7.) Children who witness domestic violence, such as that which AC witnessed Petitioner commit against Respondent, suffer emotional trauma, including shock, fear and guilt as a result. (*Id.* at 8.) AC's psychological health and well-being have improved since she was removed from the environment she associates with these distressing and traumatic events. (*Id.* at 7.) That being said, Dr. Favaro testified that the "stressors which would be related to a return to an environment which AC associates with recollections of coercion, entrapment and violence against her motion would likely cause confusion, maladjustment and panic in her[.]" (*Id.* at 7–8.) In conclusion, Dr. Favaro determined that removing AC from the United States to Brazil "would be detrimental to her adjustment and could expose her to catastrophically negative influences on her emotional health and development and as such is contrary to her best interests." (*Id.* at 8.)

## CONCLUSIONS OF LAW

**I.  Background**

The Hague Convention, to which the United States and Brazil are signatories, endeavors to "protect children internationally from the harmful effects of their wrongful removal . . . and to establish procedures to ensure their prompt return." Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1988 WL 411501, pmbl. (July 1, 1988) [hereinafter "Hague Convention"]; International Child Abduction Remedies Act, 22 U.S.C. §§ 9001–9011 (2018) [hereinafter "ICARA"] (domestic implementing legislation). A

person seeking the return of a child residing in the United States may commence a civil action under the Hague Convention by filing a petition in a court of the jurisdiction where the child resides. 22 U.S.C. § 9003(b). To obtain an order for the child's return, the petitioner bears the burden of proving by a preponderance of the evidence that the removal was wrongful under Article 3 of the Convention. *Id*. at § 9003(e)(l)(A); Hague Convention, art. 3. Specifically, the petitioner must show that: (1) the child was habitually residing in one State and has been removed to, or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of removal or retention. Hague Convention, art. 3. Once these elements are established, "the [Court] shall order the return of the child." Hague Convention, art. 12. However, the return of the child may be avoided if one of the affirmative defenses set forth in Articles 12, 13, and 20 applies. *Id.* § 9001(a)(4) ("Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies.").

There are five affirmative defenses to the return of a child under the Hague Convention: (1) the petition was filed more than a year after the child was wrongfully removed and "the child is now settled in its new environment[,]" *id.* art. 12; (2) the petitioner "was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention[,]" *id.* art. 13(a); (3) "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation[,]" *id.* art. 13(b); (4) "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views [,]" *id.* art. 13; and (5) the return of the child "would not be permitted by the fundamental

10

principles . . . relating to the protection of human rights and fundamental freedoms." *Id.* art. 20.

Here, it is undisputed that AC was a habitual resident of Brazil and was removed by Respondent in derogation of her father's right to joint custody, which he was then exercising. (*See* Huynh Decl., Ex. 7 at 2 (travel authorization form).)  Therefore, in the absence of at least one of the affirmative defenses, AC must be returned to Brazil.  Respondent asserts four affirmative defenses, two of which plainly warrant denial of the Petition.

## II. AC's Age and Maturity

"[A] court may refuse repatriation *solely* on the basis of a considered objection to returning by a sufficiently mature child." *Blondin v. Dubois* ("*Blondin IV*"), 238 F.3d 153, 166 (2d Cir. 2001).  Although the Hague Convention applies to children under the age of 16, when a child objects to repatriation and is close to age 16, courts have considered her age and maturity instead of applying the age requirement strictly. *See Laguna v. Avila*, No. 07-cv-5136, 2008 WL 1986253, at *9 (E.D.N.Y. May 7, 2008) ("[T]here is no precise age at which a child will be deemed sufficiently mature under the Convention. . . . Rather, the child's maturity is a question for the district court, to be determined upon the specific facts of each case." (internal citations omitted)).  On balance, age 13 has been determined to be sufficiently mature under the statute. *See, e.g.*, *Porretti v. Baez*, No. 19-CV-1955, 2019 WL 5587151, *1, *8–9  (E.D.N.Y. Oct. 30, 2019) (9 and 14 years old); *In re D.A.*, No. 14-CV-5836, 2015 WL 2344079, *1, *6 (E.D.N.Y. May 14, 2015) (12 years old), *aff'd sub nom. Adamis v. Lampropoulou*, 659 F. App'x 11 (2d Cir. 2016); *Matovski v. Matovski*, No. 06 Civ. 4259, 2007 WL 2600862, at *14–15 (S.D.N.Y. Aug. 31, 2007) (12 and 11 years old); *Arboleda v. Arenas*, 311 F. Supp. 2d 336, 343–44 (E.D.N.Y. 2004) (12 and 14 years old).

11

Here, the parties agree that AC has attained a sufficient age and maturity to choose where she should live, and both parties agree that AC unequivocally wishes to remain in the United States. (Evid. Hr'g Tr. vol.1, 10:10–15, 11:13–16, Dec. 7, 2020; Evid. Hr'g Tr. vol. 4, 6:5–13, Dec. 10, 2020.) The Court finds no basis to disagree with the parties' conclusions. Indeed, Petitioner conceded that it would be "disingenuous" to claim otherwise. (Evid. Hr'g Tr. vol. 4, 6:12–13, Dec. 10, 2020.) AC, who is almost 14, is well within the age range that courts in this circuit have determined to be sufficient for the child's views to be considered. *See, e.g.*, *Porretti*, 2019 WL 5587151, at *1, *8–9 (9 and 14 years old). Dr. Favaro testified that AC was "mature, sociable and affable" and "extremely" easy to engage. (Evid. Hr'g Tr. vol. 2, 219:14–19, Dec. 8, 2020.) The Court agrees. Indeed, Dr. Favaro's observations were confirmed by AC's *in camera* testimony. (Evid. Hr'g Tr. vol. 3, 243:6–22, Dec. 9, 2020.) Finally, AC's preference to stay in the United States remained unequivocal—when the Court asked AC where she wanted to live, she responded: "Here definitely." (Evid. Hr'g Tr. vol. 3, 246:24, Dec. 9, 2020.) On these facts, the Court may refuse repatriation. *See Blondin IV*, 238 F.3d at 166 (finding that Article 13 of the Hague Convention provides a separate and independent basis to refuse repatriation where the child objects and has reached a certain age and level of maturity).

Petitioner's assertion that AC's objection to repatriation is subject to a burden-shifting analysis is without merit. (*See* Evid. Hr'g Tr. 10:10–12:6.) Petitioner has cited no authority in support of this assertion in either of his pretrial or post-trial submissions. (*See* Pet'r's Pre-Trial Mem. at 11–12, ECF No. 27; Pet'r's Proposed Findings of Fact and Conclusions of Law at 20–22, ECF No. 47.) Significantly, neither the text of the Hague Convention nor the ICARA contemplate such an analysis. *See generally* Hague Convention; ICARA. Because it is the Court's "duty [] to ascertain the intent of the parties by looking to the [treaty's] text and

12

context"—which does not support any burden-shifting analysis in response to a mature child's objection to repatriation—and Petitioner has failed to "identif[y] a background principle [of burden shifting] that is shared by the signatories to the Hague Convention," the Court declines to engage in such a burden shifting analysis. *Lozano v. Montoya Alvarez*, 572 U.S. 1, 11, 12 (2014) (quotation marks and citations omitted) (finding the backdrop of American federal law inappropriate on its own to impute equitable tolling to Article 12 of the Hague Convention).[4]

### III.  Grave Risk of Physical or Psychological Harm

The grave risk defense applies where "the child faces a real risk of being hurt, physically or psychologically" and where "the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *Blondin IV*, 238 F.3d at 162 (quotation marks and citations omitted).  The grave risk inquiry is "fact-intensive" and considers a wide range of conduct, including manipulative or alienating behavior, physical or psychological abuse, spousal abuse, the petitioner's general pattern of or propensity for violence, *Davies v. Davies*, 717 F. App'x 43, 47–48 (2d Cir. 2017), as well as the extent to which the child is "so deeply rooted in the United States" that her return would result in impermissible psychological harm, *Elyashiv v. Elyashiv*, 353 F. Supp. 2d 394, 406 (E.D.N.Y 2005) (quoting *Blondin v. Dubois* ("*Blondin II*"), 189 F.3d 240, 248 (2d. Cir. 1999)).  To establish the grave risk defense, the respondent may adduce individual facts, each of which "need only be proven by a

---

[4] Even if such burden-shifting could apply, Petitioner has not offered any evidence to support the normative proposition that "the lesson we are teaching this child is that if you want something and the way to get it is to ignore a judicial decree" and that "a child should know there are consequences to behavior" (Evid. Hr'g Tr. vol. 1, 12:8–17, Dec. 7, 2020)—a proposition undermined by the very existence of the Hague Convention's affirmative defenses. *See, e.g.*, *Lozano v. Alvarez*, 697 F.3d 41, 53 (2d Cir. 2012) (finding that the "signatory states [to the Hague Convention] . . . were aware that there are situations where 'the removal of the child can . . . be justified by objective reasons which have to do either with [the child's] person, or with the environment with which [the child] is most closely connected'" (citation omitted)), *aff'd sub nom. Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014).

13

preponderance of the evidence," that, taken together, establish "clear and convincing evidence" that a grave risk exists. *Elyashiv*, 353 F. Supp. 2d at 404 (citation omitted).

"[E]vidence of prior spousal abuse, though not directed at the child, can support the grave risk of harm defense." *Davies*, 717 F. App'x at 48 (internal quotation marks and citation omitted); *see also Valles Rubio v. Veintimilla Castro*, No. 19-CV-2524, 2019 WL 5189011, at *22 (E.D.N.Y. Oct. 15, 2019) (recognizing that psychological spousal abuse, "in the form of shouting or other displays of uncontrolled anger in the presence of the child, can support an Article 13(b) defense if it is substantial and pervasive"). "A parent's general pattern of violence" or propensity for violent abuse is also relevant to the grave risk inquiry. *Elyashiv*, 353 F. Supp. 2d at 408 (finding the district court erred when it failed to credit evidence of a "more generalized pattern of violence" including a "threat to kill [Petitioner's] neighbor . . . and his fight with [another son]" (quoting *Walsh v. Walsh*, 221 F.3d 204, 219–20 (1st Cir. 2000))). And, the Second Circuit has not,

> rule[d] out "the possibility of a case in which a petition seeking a child's return [was] filed less than a year after the child's abduction, but it [was] nevertheless established 'by clear and convincing evidence' on the child's behalf that . . . she is so deeply rooted in the United States that 'there is a grave risk that [the child's] return would expose the child to . . . psychological harm."

*Elyashiv*, 353 F. Supp. 2d at 406 (alterations in original) (quoting *Blondin II*, 189 F.3d at 248); *see also Porretti*, 2019 WL 5587151, at *10 (where a child is "well-settled" in the United States "the stress and psychological impact of returning" may be "multiplied" (citing *Blondin IV*, 238 F.3d at 165)).

There is clear and convincing evidence that returning AC to Brazil would expose her to a grave risk of psychological and physical harm. (*See* Favaro Decl., at 7–8.) *First*, AC witnessed much of Petitioner's psychological spousal abuse as well as at least one episode of serious physical violence—Petitioner's attempt to suffocate Respondent. This sort of spousal abuse has

14

had a lasting and profound effect on AC, who still recalls the details of such abuse.  (*See* Evid. Hr'g Tr. vol. 3, 237:16–24; 238:16–22; 239:6–11; 239:16–242:6.)  Returning to the site of that abuse would only intensify its traumatic effects.  (*See* Favaro Decl., at 8.)  *Second*, AC herself has suffered, and continues to suffer psychological harm as a result of Petitioner's behavior.  The record is replete with instances when Petitioner has sent AC alarming, and sometimes threatening text messages, including messages reprimanding AC for disrespecting and disobeying him and others insisting that her mother is a criminal who must be punished.  (*See* Huynh Decl., Ex. 39 at 5–8, ECF No. 30-41.)  Incredibly, at one point Petitioner sent AC a message attaching a photo of a gun.  (Huynh Decl., Ex. 17.)  These communications have made AC "stressed out," and AC "feel[s] so uncomfortable when [Petitioner] starts talking about [Respondent] because . . . you just shouldn't talk about your other significant parents like that to your own child."  (Evid. Hr'g Tr. vol. 3, 247:25-248:5, Dec. 9, 2010.)  As Dr. Favaro testified, if AC is forced to return to Brazil, in close physical proximity to her father's manipulative and alienating behavior, she will be overcome by "a sense of fear that [would] pervade[] all elements of [her] life," akin to "being taken hostage."  (Favaro Decl. at 9.)  Further, returning to that environment "would likely cause confusion, maladjustment and panic" and "would be detrimental to her adjustment and could expose her to catastrophically negative influences on her emotional health and development."  (*Id*. at 7-8.)  Accordingly, Respondent has established the grave risk of harm defense under the Hague Convention.[5]

---

[5] Having found these defenses provide a basis for denying the petition for repatriation, the Court need not entertain the additional defenses raised by Respondent.

15

## CONCLUSION

For the foregoing reasons, the Amended Complaint seeking AC's return to Brazil is DENIED.

                                                         SO ORDERED.

Dated: Brooklyn, New York                 /s/ LDH
       January 10, 2022                        LaSHANN DeARCY HALL
                                                    United States District Judge